Thank you, your honors. Okay, the last one is Pop Vapor versus the FDA. Okay, Mr. Heyer, I take it you've been able to listen to these earlier arguments? I have, your honor, and thank you for the court's indulgence for allowing me to appear remotely. I'll try to avoid re-plowing the same ground if I can. Eric Heyer, may I? Let's have the courtroom deputy decrease the volume a little. It's no fault of your own, Mr. Heyer. He's not going to mute you, Mr. Heyer. It's in your interest for us to do that, and I promise you a little. Okay, Mr. Heyer. Thank you, your honor. Eric Heyer on behalf of Petitioner Pop Vapor Co. LLC. I actually want to start by talking about a point, while it may have been raised in the briefing of the cases, it certainly hasn't gotten any airing in oral arguments so far today, nor I believe in any of the other circuits where these similar appeals have been pending. And that's a question of FDA statutory authority or lack thereof to demand this comparative efficacy evidence under Section 910 with the Food, Drug, and Cosmetic Act. And we did brief this, and I want to just hit it because it is a little bit different angle coming at these issues. Section 910 does not contain the word effectiveness or efficacy. In that respect, it's very different than the statutory authority that Congress has granted to FDA with respect to new drug applications, including new drug applications for, for example, nicotine replacement therapies or smoking cessation drugs. And if you read the Congress's findings of fact and statement of purpose in establishing the Tobacco Control Act, it's very clear that Congress was concerned about two things. One, the physiological harms of tobacco products writ large, which ends are one subset, and two, how these products are labeled and how they're advertised and marketed. Weren't they also concerned about pediatric use that, you know, about kids' use? Isn't that one of the findings that they set forth in their special note? That's correct, Your Honor. Now, the D.C. Circuit in the Nicopere Labs case made a point, which I think is very important for this court to consider, when it said that in establishing the APPH standard would be appropriate for the protection of public health standard, Congress intended to adopt a, quote, less exacting standard than the new drug standard, the safe and effective standard under 21 U.S.C. Section 355. And what fed into that analysis is there's another provision, the very next section of the Tobacco Control Act, which has established this category of modified risk products. And what it essentially says is after you get a marketing order under the APPH standard, you have to go in and put another application in and get the blessing of FDA to be able to market an ENDS product or any other tobacco product in a way that makes a comparative claim about it versus another tobacco product. Even the basic claim that these products, ENDS products, don't contain tar in the aerosol, that cannot legitimately be made by anyone in this industry without an approved modified risk product. So what the Nicopere Labs court was saying is saying this standard is a lower standard, certainly maybe not so much when it comes to safety, but certainly when it comes to any sort of showing of effectiveness or efficacy, this is a lower standard than the new drug standard. But what we have here and what FDA has done through all of these, and FDA has now come on record and said something like 99% of the applications for flavored ENDS products have been denied, that were put in before the deadline of September 9th, 2020. What they've done is they've effectively flipped the standard on its head and created an absurd outcome when one looks at what Congress put in the statute and charged the FDA with doing. Because what FDA is now demanding is that if it is not a tobacco flavored ENDS product, not only must the applicant show baseline efficacy and that it helps promote smoking cessation of combustible cigarettes, but now on top of that, we have comparative efficacy. So not only does it have to have some baseline efficacy, it must be better than the tobacco, a comparative tobacco flavored ENDS product in order to be entitled potentially to a marketing order. That's actually a higher and more demanding showing that even the nicotine replacement therapy drug would be required under FDA's statutory drug authorities. Is your argument then that in light of the evidence that the flavors are causing this epidemic among youth and using ENDS products and then smoking, is your argument that that should be ignored and not considered in the analysis because of reasons that you've explained that the FDA can't look at the benefit or the lack of benefit of flavors over tobacco flavors in comparison in the switching or the primary use, I guess, or the quitting of smokers? What I would say is if one accepts the premise, I don't necessarily accept the premise, but if one accepts the premise that flavors are the driving issue behind the youth usage of ENDS products generally, then there are other ways for FDA to account for that, including and specifically, and I think this is actually what Congress intended, by looking at the advertising, the marketing, the labeling. FDA has the statutory authority to express restrictions on when they grant a marketing order on how and where and to whom the products can be advertised. What if they find that the marketing restrictions don't work? Are they out of options? Do they then not have to comply with the requirement under the TCA that they are not to approve an application that they find is not appropriate for promotion of the public health because of the use of the youth and the lack of benefit? These are assumptions, of course, for purposes of the hypothetical question and the lack of benefit of the flavored products versus the tobacco and menthol flavored products. I guess I want to understand the hypothetical and make sure I have it correct. The hypothetical is the product is attractive to youth because of flavors. There is a comparatively low showing of benefits to adults. Yes, tobacco flavored and menthol flavored. The marketing plans don't solve the problem with the youth. Do they then have to ignore that problem with the youth and then approve an application which they find is not appropriate to the promotion of the public health? I'm not arguing that the application necessarily has to be approved. What I'm saying here is because this is a threshold first-level inquiry that they've clearly done by their own admission, by looking at anything else in the application, that this is improper. They would have to then look at the application as a whole and make a decision weighing all of the contents of the application as they repeatedly said that they would, as they've said the statute mandates that they do. The problem is here, and I don't want to repel old ground, but the fact of what they did here is they basically split the substantive scientific review up into two parts. The first hoop to jump through was this presence of the search for the fatal flaw review, searching for an RCT or longitudinal cohort study or this somewhat undefined other evidence. If that wasn't present, then that was it. They didn't look at anything else. They could still ultimately deny it on the merits, but what they did here is certainly improper, and it's not supported by the statute, the specific demand for the comparative efficacy evidence. One of the points, too, and we've briefed this. I don't want to belabor the point, but FDA, on this point, FDA's own guidance when it explains what is required in an application under section 910B1A specifically talks about physiological harm. When they're interpreting the word health risks under the first prong of what's required in an application, they talk about studies assessing constituents of tobacco, aerosol, toxicology, consumer exposure, consumer user profiles, which could be things like the topography, how often and how frequently and what volume of aerosol is inhaled, how much people use them, etc. These are not cessation behavioral-type inquiries, and that's FDA's own guidance. That's how FDA itself interpreted the specific subsection. So for FDA to now come back in response to this argument and say, well, the word health risk actually means cessation, I think they're adding on to what Congress put in the statute and imposing and grafting on new requirements. I also want to just hit on, because I don't have a lot of time, I still have, I wanted to hit on the point about the April 2020 guidance, because this has come up in the course of litigating all of these cases, and there are a couple of things I'd like to stress about that. This is an enforcement guidance about FDA's deferred enforcement policies and which products could or could not stay on the market. This document, at the time it was issued, was not at all correlated by FDA with the PMTA process, with applying for marketing authorization. What FDA has done, and this falls, I think, in the bucket of attempted post-hoc rationalization, which is impermissible, is they've now come back and said, well, look at what we said a couple of years ago when we went to five big tobacco companies or five large companies that happen to sell ENDS products and asked them about what marketing restrictions they're doing, and this is what they said, and we don't think that's enough, so we're going to go ahead and use that as, again, a post-hoc rationalization to try and argue that we have harmless error in our complete oversight of reviewing the marketing plans. I think the Triton Court in the Fifth Circuit, I hit the nail on the head, it's just like an Article III judge saying I'm not going to look at briefs anymore because the ones I've seen up to this point haven't been helpful. I don't see how that's – I understand that that's in the Fifth Circuit case, and with all due respect, I don't see how that really is helpful, and I'll tell you why. Because when you're talking about briefs, they're all different cases. I mean, they involve all different subject matter. I mean, I don't see how that translates at all to the situation where the FDA has been looking at for years, has been looking at marketing plans, has attempted to resolve the problem with use through marketing plans. They tried to do that before they started enforcing, doing enforcement actions against the actual products themselves, and, you know, nothing has worked. Nothing has worked. That's why they had to go to the enforcement actions. Why isn't it permissible for them to look at what you guys have said, and if you haven't said something new, right, why isn't it permissible for them to make a determination without going and doing a thorough review, word for word of everything that's in there, that your marketing plans cannot possibly provide evidence that it's appropriate for the promotion of the public health when they have not seen a single item in marketing plans over many years that has, and you haven't called their attention to it. They've explained that in some situations, you know, with respect to products that are, you know, being sold in such a way that only an adult can actually use it, they are considering it because that's something new. So my question for you is what is in your application that's new that they haven't already looked at and found that it doesn't work, and why would they have to spend time to go through all of that again when they've already found that it can't solve the problem? Your Honor, respectfully, I would urge the court to go back and read the April 2020 enforcement guidance because what it actually contains is it calls out specific things that FDA says are proper to the proper marketing and advertising restrictions to try to prevent youth usage, and some of those are in my client's marketing plan, things like having a phone number where one can call and report underage sales anonymously. FDA, it's actually quite the opposite. FDA lists in there, and I was trying to find the PIN site. I know it starts at JA75 is where it cites, but some of the things that FDA specifically called out is the types of things companies should be doing to avoid enforcement were found in the marketing plan, and yet FDA says, well, after the fact, that's not enough. That's not acceptable. Well, let me just make sure I understand. Are you saying that there's something, and maybe there is. I could have missed it. Is there something in the guidance that says that if you do these things, they will be enough, and they will outweigh any use by youth of flavors? No, because that wasn't the issue, but what it does say is that it has recommendations. FDA put forth recommendations that it recommended that companies and manufacturers and retailers follow to avoid the issue of youth usage of their products and potential enforcement, because, again, PMTAs were not the subject of this enforcement guidance. This is on a totally separate subject that's now being repurposed post hoc to help justify this litigation for FDA's benefit, and let me try and find the PIN site real quickly. The court will indulge me. It was specifically talking about the types of actions that companies could take, and it listed a number of them to avoid enforcement because of concerns about products being available for minors, and those are the types of things, like the phone number and that, that are listed. It's on JA97 in the enforcement policy in the joint appendix. It talks about monitoring retailer compliance, manufacturing enforcing penalties against retailers, age verification technology, limiting the quantity of products that can be sold in any given transaction. So those are actually the – keep in mind, there was no final rule by the time this deadline hit. This was all that this industry had to go off of was really the 2019 guidance, a proposed rule that talked about and stressed the importance of marketing plans, and this guidance wasn't really on people's radar because this was about enforcement. This wasn't about what you do to go into a PMTA, and yet these marketing plans are so stressful. So I'll stop there. I think we understand your point, Mr. Heyer. You've saved four minutes for rebuttal. Mr. Belfer. May it please the court, Isaac Belfer for the government. Petitioner makes flavored e-cigarettes in flavors such as peach ice cream, custard craze, and pink punch. Given the scientific consensus that flavored e-cigarette products, such as Petitioner's, present a substantial risk to kids, FD looked for evidence that Petitioner's flavored products provide a sufficient benefit to adults to outweigh their substantial risk. Petitioner failed to make that showing. Its applications did not contain any studies of its own products. Counsel, I'm sorry to interrupt, but what do you say about opposing counsel's argument that they could have taken care of it through marketing or basically through a marketing plan and that FDA encouraged that at some point in not necessarily its guidance, I guess, but in its discussion of enforcement actions and how to avoid them? FDA has extensive experience with sales access restrictions, such as checking IDs, and advertising restrictions, such as prohibiting packaging that appeals to youth. FDA found that those measures are insufficient to mitigate the substantial risk to kids posed by flavored e-cigarettes. That analysis is set out in the 2020 guidance. What about opposing counsel's argument that this is post hoc rationalization and that you're repurposing a document that was created for another reason to justify your alleged change in policy? Your Honor, the 2020 guidance described how FDA had attempted to focus solely on these sales access and advertising restrictions, but that didn't work because when they prohibited cartridge-based products, youth just migrated to disposables. I think there's simply no inconsistency here. The 2020 guidance never said that sales access and advertising restrictions are sufficient to mitigate the substantial risk to kids. Instead, what the 2020 guidance said is that they might be helpful. They might be one thing that could help reduce the risk. But when you have products such as flavored e-cigarettes that pose a substantial risk to kids, you need to provide a benefit that might outweigh that. What you have here is you have this substantial risk to kids. You have a lack of a showing that there is an adequate benefit to adults. What FDA found is that sales access and advertising restrictions can't close the gap between the risks and the benefits to show a benefit to public health. Why is that? Does it say anywhere in any of the documents that the FDA has produced why that is? Yes, Your Honor. In the decisional memorandum, it explains that you have a very substantial risk to kids and that there is a consensus in the literature, which Petitioner does not dispute, that there is a substantial risk to kids. Are you suggesting that it's because you can't completely eliminate the risk that the products will be used by kids even in the best of marketing plans? Correct. Even in the best sales access restrictions, checking ID every time. Where in FDA's work could we find something that would support that? So the 2020 guidance, and so this is at page JA119. The 2020 guidance states, FDA believes that age verification alone is not sufficient to address youth use of e-cigarette products, given the most recent data that youth use of such products continues to increase despite FDA's vigorous enforcement of age verification requirements. I got you. You're doing everything as far as age verification and access restriction or the companies are that you're aware can be done and still you've got increased use of the products by kids. Correct. So marketing restrictions might be helpful, but they're not sufficient. What about a marketing restriction that said you were only going to sell cigarettes to federal judges? That was your marketing plan. Would that be something that the FDA would at least have to consider? That would be a sales access restriction. Right. Yeah, it would. The problem here is that when you limit who you can sell e-cigarettes to, for instance, only sell them to adults, only sell them to adults with very good ID, the problem is that kids often get e-cigarettes from friends or family. And so limiting just who you sell the e-cigarette to is not going to be enough to mitigate that substantial risk to kids from flavored e-cigarettes. So, I mean, your position then is that any marketing plan, even one that said I'm only going to sell e-cigarettes to FBI agents, is just per se something you don't have to consider because it's never going to be enough as long as it fits within the rubric of a sales restriction. Right. I mean, that's your position, right? Right. The FDA is saying that sales access restrictions and advertising restrictions, although they certainly can be helpful, they themselves are not sufficient to mitigate the substantial risk to kids when you have this scientific consensus on a substantial risk to kids and you have a lack of a showing of a benefit. Marketing plans, including sales access restrictions, advertising restrictions, they can't close the gap. Yeah, that seems so hard to say, though, when you're not actually looking at who the sales are restricted to, right? My concern in this, the weakest part of your position, I guess, is that, okay, I can see your point that, as a general matter, the FDA could say these are not going to be successful, but it seems you still have to look at them to determine who they're suggesting that they're restricting the sales to, right? I mean, at some level, you still have to consider it. Well, you know, FDA has extensive experience with these restrictions. It's considered many marketing measures over many years. I mean, so, like, I was a district judge for a year. I mean, I sentenced, like, 90 people. I mean, it seems like it would be very unfair for me to say, you know what, I just don't care what you say, Mr. Criminal Defendant, about how you're going to reform yourself or about how you're going to, you know, the impact this is going to have on your family. You know, in my experience, I've found that those things don't matter, so I'm just not going to listen to you, right? That's different than listening to them and then saying, you know what, I've heard that a million times, I don't care. You at least have to listen and consider, right? And that seems like the FDA did not do that here. So FDA has not said that all measures to restrict youth access are necessarily not going to work. There have been... So we've talked about sales access restrictions and advertising restrictions. There's a third category, device access restrictions, which are engineering measures that physically lock a device against unintended users like kids. There have been three manufacturers that have proposed such device access restrictions, and FDA has found that that's enough to proceed to further scientific review. So there are some measures that might be enough, but here Petitioner does not claim to have proposed any device access restrictions or really anything that's any materially different than what FDA already considered. Let me ask you something about that, if you don't mind. I think I do recall reading something in one of these things where the FDA says the problem is that a lot of kids get these devices from their friends or family members. And so, first of all, I have two questions. One is, can you remind me where I read that, if it's in there? And if it's not in there, just let me know. And second, if that's the case, and the problem is kids getting the stuff from family members or friends, then I guess the question is, or I guess your answer might be, that the first and second categories don't address that problem, but the third category does, because if it's locked and only an adult can unlock it, then it wouldn't be an issue. Right, Your Honor. So I believe the analysis that kids get these products from friends, that's in the decisional memorandum. That's when they're explaining why sales tax and advertising restrictions aren't enough. As to the effect of device access restrictions, it's correct that if you have an engineering measure that physically locks a device, that's going to prevent a kid from using it, because even if they get an e-cigarette from an adult friend or family member, they can't use it if it's physically locked. But here, Petitioner has not claimed that it proposed any device access restrictions. And so because it hasn't claimed to propose anything different, it hasn't met the required showing. And I would note that even if the court finds that FDA should have considered the marketing plan, the Tobacco Control Act incorporates the APA's Harmless Error Rule, and so the court would need to ask, well, even if there was an error, did any harm flow from that? And here the answer is no, because Petitioner has not claimed to propose anything different than what FDA already considered and found insufficient to mitigate the significant risk to kids. I'd like to turn to the notion of comparisons. So Petitioner is arguing that FDA was not allowed to require a comparison to tobacco-flavored products. But the notion that you need to compare your product to other tobacco products flows directly from the statute, which directs applicants to provide evidence regarding whether their tobacco product presents less risk than other tobacco products. And similarly, in the 2019 guidance, and this is at page JA213, FDA said, we recommend an applicant compare the health risks of his product to a product within the same category, that is, other e-cigarettes. This comparative health risk data is an important part of the evaluation of the health risks, the health effects of product switching. And then at JA242, FDA advised applicants to provide evidence regarding whether the new tobacco product presents less risk than other tobacco products in the context of analyzing the appeal and use of end-product flavors among adults. And so both the statute and the 2019 guidance are saying that you need to compare your product to other e-cigarette products. Now, in doing the risk-benefit analysis, FDA cannot ignore that tobacco-flavored products presented potentially similar benefits to adults as flavor products but present less risk to kids. If flavored e-cigarette products do not have an added benefit over tobacco-flavored products, but they have a higher risk to kids, then it would not be appropriate for the protection of the public health to market those higher-risk flavor products. And I would note that Petitioner's own application recognized the importance of showing an added benefit of its flavored products over tobacco-flavored products. And this is at page JA319. The application stated that smokers who vaped flavored e-liquids were more likely to quit smoking than those who vaped tobacco flavors. So Petitioner's application recognized what was needed to meet the statutory standard, but it failed to include the evidence needed to make that showing. Now, Petitioner argued that the statute is only concerned with physiological health risks. That's not true. There's no basis in the statute to restrict the FDA's analysis only to physiological risks as opposed to the health risks more broadly of using e-cigarettes. Additionally, using e-cigarettes or using combustible cigarettes, that is a health risk. That can cause a number of health problems. And so Petitioner can't limit the statute to block FDA from considering the very real health risks of using e-cigarettes. I'd like to touch on one other point that the Petitioner made in its argument. Petitioner said that FDA is imposing a higher, a more rigorous standard than the new drug standard or the modified-risk tobacco standard. That's not true. So those standards deal with different topics. The new drug standard obviously deals with new drugs. The modified-risk tobacco standard deals with where a manufacturer is making claims that their product is less risky than other products. FDA did not apply those standards. FDA did not require any showing of a particular level of efficacy, for instance, efficacy in promoting cessation or reduction. Instead, what FDA did is it applied the Tobacco Control Act standard. It asked whether Petitioner's products had a net benefit to public health, considering the risks and benefits to the population as a whole, including whether they would help existing use of tobacco products stop or would lead new users to start. And so the analysis that FDA did, again, it was not seeking any particular level of efficacy. Instead, it was doing the risk-benefit analysis. That is precisely what the statute instructs it to do. So given that there is this substantial risk to kids from flavored e-cigarettes, and given that Petitioner has not shown an adequate benefit to adults, FDA found that Petitioner had not shown a net benefit to public health. And notably, if you read Petitioner's briefs, Petitioner never actually argues that it submitted enough evidence of benefit to meet the public health standard. It criticizes FDA's reasoning, but it never actually argues that it submitted enough evidence of benefit to show a net benefit to public health. And so because Petitioner failed to meet the net benefit standard, FDA properly denied its application. And if the Court has no further questions, we would urge the Court to deny the petition for review. Thank you. Mr. Heyer, I'm going to try to keep you to the four minutes. Okay. I have three points I want to hit quickly, Your Honor. The first on the harmless error point, the failure to look at the marketing plan infected the entire process, even though this was only a fatal flaw, sort of first-level substantive scientific review, and FDA ignored the rest of the application by its own admission. Because FDA says essentially it applies a sliding scale. The APPH standard looks at a sliding scale, and it weighs the risks and the benefits. So if FDA misconstrues the risks of youth uptake of these products, either by, for example, failing to look at a marketing plan and realizing the restrictions that are in the marketing plan, or in this case some of my client's products were bottled e-liquids, misapprehending the risks, and we briefed this extensively, associated with bottled e-liquids versus cartridge-based or disposable products, then what FDA is necessarily doing is creating an artificially heightened burden of proof on the applicant to show corresponding benefits that would then entitle them potentially to a marketing order. So there's no way it's absolutely prejudicial error on both of those counts, ignoring an important aspect of the problem when it comes to the bottled e-liquids, overlooking the marketing plan as well in contradiction of all its previous guidance and statements, and that's prejudicial error. It's far from harmless error because it adjusted, it necessarily infected and tweaked that sliding scale. Secondly, I want to touch on the device restriction point. Again, a good number of the products that were submitted by my client are bottled e-liquids. They come in plastic bottles, and they're used to refill open system devices. These are not disposable products that are prefilled. They're not cartridge-based products like a Juul, for example, that are prefilled. So the very concept of some sort of device-based access restriction where someone has to put a thumbprint on there or use an app on their iPhone has just no applicability to that category of products. It's an absolute red herring that FDA is raising with that argument when it comes to the e-liquids. It's just not an opposite. But if the problem is youth use, why isn't the FDA entitled to look for something other than marketing restrictions and access restrictions, marketing and I guess the way you package it and the way you allow for access to it, to ensure that kids aren't getting this stuff? I mean, is there something else that could be used that was in your plan with liquids, just the liquids themselves that you're talking about? Well, I mean, there are a number of restrictions. For example, they're not advertised. One of the things the April 2020 guidance didn't talk about is any sort of advertising channel restrictions. There are advertising channel restrictions. For example, the marketing plan suggests they're not going to do television advertising of those products, for example. But one point I want to make about the bottled e-liquids, it's in the brief, is in the last few years, youth usage of all ends has been declining precipitously and the use of bottled e-liquid or devices that would be compatible with bottled e-liquids was very low to begin with and has gone even lower. So the trend is not in the direction that FDA keeps hinting at and suggesting here in terms of the youth epidemic. The last point I just want to make clearly. I'm sorry. Can you point me to where I could find that in your application as to what those numbers would be? Well, it's in the briefing. It's probably in the literature in the application. I don't have the exact J site in front of me, Your Honor, but that's the 2019 and 2020 NYTS, 2021 NYTS, bear that out. And just the last point I want to make very quickly is in any of these guidances, the 2019 final guidance proposed rule, there was never any specific wording suggesting a comparison with the tobacco-flavored ENDS product was necessary for a non-tobacco-flavored product. Under United States v. Chrysler, maybe extraordinary intuition or the aid of a psychic would have allowed our client to know that that was required, but we didn't have that. So with that, I'll conclude. Respectfully request that the court vacate the marketing denial order. Okay, Mr. Heyer. We understand your case. Thank you for your argument. The remote worked well. We heard you well on this end. So we'll be in recess until tomorrow.